**Michael QUEEN, Appellant**

**v.**

**Ed SCHULTZ, Appellee**

**No. 15-7094**
**September Term, 2016**

United States Court of Appeals, District of Columbia Circuit.

Filed: 12/09/2016

* Chief Judge Garland and Circuit Judge Pillard  did not participate in this matter.

814

Steven William Teppler, Abbott Law Group, PA, Jacksonville, FL, Frazer Walton, Jr., Esquire, Law Office of Frazer Walton, Jr., Washington, DC, for Plaintiff–Appellant.

John Carney Hayes, Jr., Brian James Whittaker, Esquire, Attorney, Nixon Peabody LLP, Washington, DC, for Defendant–Appellee.

Before: Brown and Srinivasan, Circuit Judges, and Randolph, Senior Circuit Judge.

## JUDGMENT

Per Curiam

This appeal was considered on the record from the United States District Court for the District of Columbia, and briefed and argued by counsel. The Court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). For the reasons stated below, it is

**ORDERED AND ADJUDGED** that the District Court's May 18, 2015 judgment and August 5, 2015 order be affirmed.

In January 2008, NBC cameraman Michael Queen met Ed Schultz in the hallways of NBC after Schultz had finished taping a guest appearance on the television program *Hardball with Chris Matthews*. Queen, a fan of *The Ed Schultz Radio Show*, approached Schultz about the possibility of working together to develop a program starring Schultz for network television. Hoping to generate interest from media providers in the prospective program, Queen and Schultz soon thereafter began producing a promotional package. Despite Queen's urgings, however, the parties at no time executed a contractual agreement. Between late 2008 and early 2009, Schultz independently negotiated with Phil Griffin, the President of MSNBC, for the creation of *The Ed Show*. The show, which ran from 2009 to 2015, did not include Queen in either an employment or a financial capacity.

In May 2011, Queen initiated this suit against Schultz, alleging breach of contract, breach of implied-in-fact contract, fraud in the inducement, tortious interference with business relationships, and intentional infliction of emotional distress. The district court granted summary judgment in Schultz's favor on all claims. *Queen v. Schultz*, 888 F.Supp.2d 145, 149 (D.D.C. 2012). This court affirmed in part,

but remanded to allow Queen to present to a jury his "partnership theory"—namely, that he and Schultz had entered into a business partnership together, such that Schultz had violated his duty of loyalty to Queen by cutting Queen out of Schultz's eventual deal with MSNBC. *Queen v. Schultz*, 747 F.3d 879, 881-82 (D.C. Cir. 2014). After an ensuing trial, the jury found in Schultz's favor, concluding that he and Queen had never formed a partnership. *Queen v. Schultz*, 310 F.R.D. 10, 12 (D.D.C. 2015). Queen moved for a new trial and for substitution of a different judge on the grounds that the district judge who presided over the trial had made a number of erroneous and prejudicial rulings and was impermissibly biased in favor of Schultz. The district court denied those motions. *Id.* at 13, 20 n.17. Queen now appeals.

■ Queen first claims that he is entitled to a new trial because the district court improperly refused to admit approximately 1,200 e-mails Queen sent and received in his alleged role as Schultz's business partner. We review the district court's evidentiary ruling for abuse of discretion. *See, e.g., United States v. Fahnbulleh*, 752 F.3d 470, 478 (D.C. Cir. 2014). We conclude that the district court did not abuse its discretion in finding that the e-mails lacked the requisite "indicia of trustworthiness" to be admitted under the hearsay exception for business records. Trial Tr. 220 (May 1, 2015); FED. R. EVID. 803(6)(E).

Under Federal Rule of Evidence 803(6), we look to whether "testimony of the custodian" of the records demonstrates that "making the record was a regular practice" of the business (i.e., the ostensible partnership). The district court, answering that question in the negative, explained:

It's not clear [from Queen's testimony] whether [he] had conversations with Mr. Schultz about who [was] responsible for keeping e-mails in the course of their interchange, which e-mails were required to be sent, which e-mails he was required to send, which e-mails he was required as part of this business activity to [retain], who was going to be a designated custodian, which e-mails were going to be considered vital or necessary elements of communications among the partners, [or] whether the e-mails were going to be relied upon in the conduct of their business.

Trial Tr. 217-18. That assessment accords with Queen's own admission that his "focus was to get a television show, not to keep records exactly accurate." *Id.* at 203. In those circumstances, we cannot find that the district court abused its discretion in declining to admit the e-mails as records kept in the regular course of a business. It bears noting, moreover, that a number of the e-mails were ultimately admitted during the trial on other grounds.

■ Queen next objects to a limiting instruction provided to the jury concerning 226 pages of e-mails exchanged between Queen and Schultz that were proffered by Queen just as he rested his case-in-chief. Queen sought to introduce those e-mails "not for the truth" of the matters asserted in them, but as evidence of his "state of mind" and as "circumstantial evidence of the fact that a partnership relationship existed." Trial Tr. 173, 179 (May 14, 2015). But the district court instructed the jury to consider the evidence solely "to provide information about the state of mind of the plaintiff during the course of these e-mail communications." Trial Tr. 201 (May 14, 2015).

The district court did not abuse its discretion in giving that limiting instruction. As an initial matter, the distinction Queen attempts to draw between the purpose for which he sought to use the e-mails (as

circumstantial evidence of the existence of the partnership) and the purpose for which the district court allowed the jury to use them (as evidence of state of mind) is ultimately illusory. Because the existence of a partnership under D.C. law is a question of whether two or more individuals "intend to associate together to carry on as co-owners for profit," *Beckman v. Farmer*, 579 A.2d 618, 627 (D.C. 1990), the e-mails provide circumstantial evidence of the partnership's existence precisely *because* they reflect the contemporaneous state of mind of the parties. The district court's decision to resolve the admissibility of the e-mails under the framework provided by Federal Rule of Evidence 803(3)'s "state of mind" exception was therefore within the court's discretion. And although the 226 pages of e-mails in theory could also have been admitted to show Schultz's state of mind (not just Queen's), Queen's counsel stated at trial that the e-mails should be admitted only "for the state of mind of *my client*," and Queen's briefing before this court does not appear to contradict that position. Trial Tr. 173 (May 14, 2015) (emphasis added).

◼ Queen further contends that the e-mails from Schultz should have been admitted as opposing party statements under Federal Rule of Evidence 801(d)(2). Queen, however, failed to make that argument in the district court. We therefore review the argument for plain error, *see United States v. Reed*, 522 F.3d 354, 360 (D.C. Cir. 2008), and we find no plain error here. When discussing the admissibility of the e-mails with the district judge, Queen's counsel agreed that he was not "offering them for the truth" of the matters asserted in them and instead "ask[ed] that [the judge] give a limiting instruction" to the jury concerning their admissibility. Trial Tr. 179-80 (May 14, 2015). Those actions verge upon waiving this line of argument

entirely; at the least, they indicate that the district court's eventual limiting instruction was not plainly erroneous. Furthermore, even if the court had erred in declining to allow the jury to consider the e-mails sent by Schultz for the truth of the matters asserted in them, Queen fails to demonstrate that the error would have affected his substantial rights, as he would need to do to satisfy the plain-error standard. *See Coleman–Lee v. Gov't of Dist. of Columbia*, 788 F.3d 296, 299 (D.C. Cir. 2015). Numerous e-mails exchanged between the two had already been admitted as exhibits earlier in the trial, and the limiting instruction still permitted the jury to consider the light they shed on Queen's state of mind at the time, which is undoubtedly relevant to the ultimate inquiry of whether a partnership existed. Under the deferential plain-error standard, we are unable to award Queen a new trial based on the district court's limiting instruction.

◼ Queen next contends that certain statements made by Schultz's counsel during opening and closing arguments require a new trial. Because Queen did not object to those statements in the district court, we again review for plain error. With regard to the opening argument, Queen contends that Schultz's counsel improperly referenced Queen's failure to prevail on other theories of liability in earlier stages of the litigation. Counsel observed that the district court had previously determined that Queen was not "Mr. Schultz's agent" and "didn't have a contract" with Schultz. Trial Tr. 41 (May 11, 2015). Those references were improper, Queen argues, because past judgments are generally considered inadmissible hearsay, and opening statements are traditionally confined to comments on evidence expected to be introduced during trial. Regardless of whether the admission of those statements

was erroneous, we find that any error did not affect Queen's substantial rights and did not seriously affect the fairness or integrity of the proceedings, as would be necessary to find plain error. *See Coleman–Lee*, 788 F.3d at 299. The jury was instructed that opening arguments are not evidence, and Queen points us to no further reference to past stages of the litigation and no effort to exploit the brief references in opening arguments.

■ Queen similarly fails to demonstrate plain error with regard to his argument that Schultz's counsel's two passing references to "indentured servitude" during closing arguments improperly inflamed the passions of the jury. Those statements did not go "well beyond the limits of legitimate advocacy," such that "the integrity or fundamental fairness of the proceedings in the trial court is called into serious question." *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1148, 1150 (9th Cir. 2001). Indeed, Queen's own counsel made statements about slavery during closing arguments. As we have explained, "the District Judge is better situated than we are to assess the impact of both sides' hyperbole upon the jury." *United States v. North*, 910 F.2d 843, 895 (D.C. Cir. 1990).

■ Queen next challenges the district court's denial of his pretrial spoliation motion, which alleged that Schultz had improperly deleted his e-mails after the point in time that he should have been on notice of the possibility of litigation. For his part, Schultz admits that he "didn't save any e-mails in relationship to this legal action until [he] found out [he] was being sued … in April of 2009." Trial Tr. 140 (May 1, 2015). According to Schultz, his deletions prior to that time are explained by the fact that he "periodically delete[s] e-mails" because he gets "hundreds of e-mails a day." *Id.* In an attempt to undermine Schultz's account, Queen points to a number of prior

e-mails exchanged between the two in which they discussed, for example, possible profit-sharing arrangements, as well as Schultz's plea to Queen to "leave all that legal stuff at [water's] edge until we know what we're dealing with." Mot. Sanctions and Award Attorney's Fees 3-4 (Mar. 27, 2015).

We find no abuse of discretion in the district court's decision to credit Schultz's account and to conclude that he had no obligation to preserve his e-mails until April 2009. In addition, Queen fails to show that any error in denying his spoliation motion caused him prejudice. *See* Fed. R. Civ. P. 61; *Huthnance v. District of Columbia*, 722 F.3d 371, 377 (D.C. Cir. 2013). There is no indication that any e-mails were lost as a result of the allegedly improper deletions, as Queen evidently maintained copies of his e-mail exchanges with Schultz. The fact that Queen may have been prohibited in closing statements from telling the jury that Schultz had (allegedly improperly) deleted his e-mails falls significantly short of infringing upon his substantial rights.

Queen gets no further in arguing that Jeff Landa, Schultz's attorney, had also been put on notice of the possibility of litigation before April 2009. Queen simply provides no rationale for thinking that Landa, who is not a party to this case, and who may well not have been privy to many of the parties' e-mail communications, should have been on notice before Schultz himself.

■ Finally, we reject Queen's claim that the district judge was impermissibly biased against him. None of the colloquies identified by Queen "reveal[ed] such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Judges are

given significant discretion in determining how to manage their courtrooms. That discretion was not exceeded in this case. We therefore deny Queen's claims that the district court should have granted his motions for a new trial and recusal.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41.