FILED
United States Court of Appeals
Tenth Circuit

April 15, 2024

Christopher M. Wolpert
Clerk of Court

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

JAMES R. LUCAS,

    Plaintiff - Appellant,

v.

DADSON MANUFACTURING
CORPORATION; PETER B. LUCAS,

    Defendants - Appellees.

No. 23-3124
(D.C. No. 2:22-CV-02107-KHV-ADM)
(D. Kan.)

_____

## ORDER AND JUDGMENT*
_____

Before **TYMKOVICH**, **PHILLIPS**, and **ROSSMAN**, Circuit Judges.
_____

James Lucas, proceeding pro se, appeals from several district court orders.

But his notice of appeal was filed too late to appeal from any order except the last

one, in which the court entered a consent decree barring Mr. Lucas from filing certain

new litigation.  We dismiss the portions of this appeal challenging the district court's

earlier decisions because we lack jurisdiction to review them.  Exercising jurisdiction

under 28 U.S.C. § 1291, we affirm the consent decree.

---

    * After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## BACKGROUND

Mr. Lucas was the President, Chief Executive Officer, and Chairman of the Board of defendant Dadson Manufacturing Corporation. Dadson is a family business; Mr. Lucas's former wife, Pamela K. Lucas, is a member of the Board of Directors, and Dadson is fully owned by her mother's trust, of which Pamela Lucas is a trustee. Dadson also employed the couple's son, defendant Peter B. Lucas, as its Chief Operating Officer and later as its President.

Days after Pamela Lucas filed for divorce from Mr. Lucas in 2017, Dadson terminated Mr. Lucas's employment. Mr. Lucas sued in Johnson County, Kansas, No. 17-cv-00853, for payment of deferred salary and repayment of loans he had made to the company. Dadson counterclaimed for conversion and breach of fiduciary duty. A jury found for Mr. Lucas on his claim for deferred salary, but it rejected his claim involving unpaid loans. The jury also found for Dadson on its counterclaims and awarded punitive damages. The jury's verdict left Mr. Lucas owing Dadson $239,262.59, even before the calculation of punitive damages. Ultimately the parties entered into a settlement agreement in open court, in which Dadson relinquished its right to punitive damages and Mr. Lucas waived claims against Dadson, Pamela Lucas, and Peter Lucas, among others.

In the suit underlying this appeal, Mr. Lucas sued Dadson and Peter Lucas (collectively, the defendants) in federal court in 2022. He asserted Dadson owed him for unpaid compensation and loans, the judgment in Johnson County No. 17-cv-00853 was fraudulently obtained through false testimony by Peter Lucas,

2

and the settlement agreement was invalid due to a breach by Pamela Lucas in the couple's divorce case.

The district court granted the defendants' motion for summary judgment. It held the waiver in the settlement agreement barred Mr. Lucas's claims. Because Mr. Lucas had unsuccessfully litigated in the divorce case the question of whether Pamela Lucas's conduct constituted a breach, the district court applied collateral estoppel to reject his argument the settlement agreement was invalid. The district court later addressed motions to alter or amend the judgment by both sides, granting the defendants' motion and denying Mr. Lucas's motion.

The defendants also moved for sanctions. At a hearing before the district court, the court heard testimony from Peter Lucas that Mr. Lucas had "brought approximately 85 unsuccessful claims all related to the original Dadson lawsuit" and four unsuccessful appeals, and at that time he had "six other pending claims in various jurisdictions all revolving out of money or the lawsuit either with Pam Lucas or Dadson." R. Vol. III at 90-91. The court explained to Mr. Lucas that the waiver of claims in Johnson County case No. 17-cv-00853 covered every party and every claim existing on the date the parties made their agreement in the state court. Saying it did not want to sanction him, the court asked what it would take for Mr. Lucas "to drop all this litigation, because it has to end." *Id.* at 121.

The court and the parties then discussed potential resolutions. Ultimately, the defendants agreed to withdraw their motion for sanctions in exchange for Mr. Lucas's agreement not to file any new lawsuits against Dadson and related

3

parties.  When the defendants raised a concern that Mr. Lucas would not abide by an agreement, Mr. Lucas informed the court:

> I would be very reasonable and happy with you if you wrote an order stating what we just agreed to, that I will not file any new legislation (sic) against the parties that you mentioned:  Dadson, Mr. [Peter] Lucas, and the other [defendants in Johnson County No. 17-cv-00853].  Anybody else that was involved in that first lawsuit, I would be willing to forego any new litigation there.

*Id.* at 126.  The court cautioned Mr. Lucas it would retain jurisdiction over the sanctions motion and the defendants would "find a ready ear" if Mr. Lucas violated the order.  *Id.* at 127.  Mr. Lucas responded:

> Your Honor, with as clear as you are, I don't think we're going to have any difficulties.  I think some of the other things I've seen, they did not express it as clearly as I thought.  But if you are very specific that this is what we've agreed—that we're going to exclude any further litigation, any new complaints on these—with these people but that I am allowed to pursue other things that are already in action to completion—at this point I would trust you to write an effective order that would make sense and cover that clearly and logistically in a way that even—even a Ph.D. engineer can understand.

*Id.*

The court issued its written decision on June 9, 2023.  It ordered Mr. Lucas not to "commence any new legal proceedings against Dadson" and other parties, including Peter Lucas, "which in any way relates to the Johnson County lawsuit, No. 17-cv-00853."  R. Vol. II at 501 (bolding omitted).  Noting that, in exchange, the defendants had agreed to withdraw their motion for sanctions, the district court overruled that motion as moot.  The court retained jurisdiction, however, and it

4

cautioned that "if [Mr. Lucas] violates the letter or the spirit of this order, it will readdress the issue of sanctions." *Id.*

Mr. Lucas now appeals.

## DISCUSSION

**I.    We have jurisdiction to review only the June 9, 2023, order.**

Mr. Lucas's notice of appeal identified "all adverse rulings in the entire judgment" as the subject of the appeal.  R. Vol. II at 563.  Because "the timely filing of a notice of appeal in a civil case is a jurisdictional requirement," *Bowles v. Russell*, 551 U.S. 205, 214 (2007), we directed the parties to file supplemental briefs addressing the timeliness of the notice of appeal as to the decisions preceding the June 9, 2023, order.  Having reviewed those supplemental briefs, we conclude the notice of appeal was timely only as to the June 9, 2023, order.

The district court granted defendants' motion for summary judgment and entered a separate judgment under Federal Rule of Civil Procedure 58 on February 15, 2023.  The entry of that judgment triggered the thirty-day appeal period. *See* Fed. R. App. P. 4(a)(1)(A), (a)(7)(A)(ii).

On February 17, 2023, the defendants timely moved to alter or amend the judgment.  Contrary to the defendants' argument that their motion did not affect Mr. Lucas's appeal time, the motion reset the appeal period "for all parties."  *Id.* 4(a)(4)(A)(iv).  So, Mr. Lucas had thirty days to appeal after the district court entered the amended judgment on March 8, 2023.

On April 5, 2023, Mr. Lucas timely moved to alter or amend the amended judgment. As the defendants concede, this motion extended the time to appeal from the amended judgment, *see id.*, but they assert that it did not affect the appeal period for the original judgment. We need not decide whether to analyze the judgments separately. For Mr. Lucas, the best-case scenario is his motion did extend the appeal period for the original judgment in addition to the amended judgment. Under this posture, the time to appeal the judgments and the denial of Mr. Lucas's motion to alter or amend began when the court denied the motion to alter or amend on May 12, 2023.

The defendants' motion for sanctions, filed on March 22, 2023, remained pending when the district court denied Mr. Lucas's motion to alter or amend. But unlike the motions to alter or amend, the sanctions motion did not affect the time for filing a notice of appeal. *See id.* 4(a)(4)(A); *Turnbull v. Wilcken*, 893 F.2d 256, 257 (10th Cir. 1990) (holding the appeal period began to run upon entry of order which adjudicated the merits, even though sanctions issues remained pending). Mr. Lucas attempts to distinguish *Turnbull*, arguing there was no final judgment until the district court entered the June 9, 2023, sanctions order because the case involved issues beyond the sanctions motion even after the entry of the judgments. He is incorrect. The issues he identifies were part and parcel of the sanctions inquiry. The discussions at the hearing were not a continuation or reconsideration of the merits determinations, but instead were integral to deciding whether to impose sanctions, and if so, what type of sanctions to impose.

Accordingly, the thirty-day appeal period for all the orders began running on May 12, 2023, even though the sanctions motion remained pending at that time. The appeal period ended on June 11, 2023. Because that day was a Sunday, the appeal period extended to Monday, June 12, 2023. *See* Fed. R. App. P. 26(a)(1)(C). Mr. Lucas, however, did not file his notice of appeal until July 5, 2023. His notice of appeal therefore was too late to appeal from the original judgment, the amended judgment, or the order denying his motion to alter or amend. We lack jurisdiction to review those decisions.

In contrast, the notice of appeal was filed within 30 days of the entry of the June 9, 2023, order. We have jurisdiction to review that order.

**II.     We affirm the June 9, 2023, order.**

The June 9, 2023, order is a consent decree. *See Johnson v. Lodge #93 of Fraternal Ord. of Police*, 393 F.3d 1096, 1101 (10th Cir. 2004) ("A consent decree is a negotiated agreement that is entered as a judgment of the court."). A consent decree is final and appealable under § 1291, even where the district court retains jurisdiction to oversee implementation. *See Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1190-91 (10th Cir. 2018).

We review "the interpretation of a consent decree" de novo, but we review "a district court's decision to approve a consent decree for abuse of discretion." *Johnson*, 393 F.3d at 1101-02 (internal quotation marks omitted). Because Mr. Lucas is proceeding pro se, we liberally construe his filings, but we do not act as his advocate. *See Luo v. Wang*, 71 F.4th 1289, 1291 n.1 (10th Cir. 2023).

7

**A.    The court's remarks do not require reversal.**

Mr. Lucas objects to comments the district court made during the hearing.  We are not persuaded these remarks require reversal of the consent decree.  "[J]udicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994).  When read in context, the remarks Mr. Lucas identifies do not reveal antagonism against Mr. Lucas, much less antagonism of the required high degree.

Mr. Lucas objects that the district court mocked him by saying he should think about going to law school.  The record does not indicate, however, that the comment was mockery.  After the court told Mr. Lucas that his "stipulation of dismissal covers every party and every claim that existed on that date when you made it in open court on the transcript," R. Vol. III at 127, and "I think this kind of litigation is harassment," *id.* at 128, they had the following exchange:

> MR. LUCAS:  . . .  I know how you're reading it and I accept your honest assessment[;] my intent was not to harass.  So it was not to do anything in bad faith or maliciously.  I really thought I had a workable strategy, and I was just looking for some justice, and, again, some ability to move forward . . . and have some funds to be able to live, build upon.

> THE COURT:  So what you might think about doing is going to law school, because then you could be a more effective litigant and maybe you could find a second career that would be of satisfaction to you.  You could live another 30 years.

8

*Id.* The entire discussion shows the remark was more tempered than Mr. Lucas's interpretation.

Mr. Lucas also complains the court made other inappropriate comments, including saying "that [he] should 'lay down the weapons and die,'" Aplt. Opening Br. at 32 (quoting R. Vol. III at 119), dismissing his theory of the case by saying it was "'building into an edifice to sustain your litigation strategy' . . . with nothing to define what that meant," *id.* at 33 (quoting R. Vol. III at 119), and making "a joke at the expense of Appellant, about a 'client who has himself as a lawyer . . . has a fool for a client.'" *Id.* (quoting R. Vol. III at 119).

These remarks were all part of the same discussion:

> THE COURT:  So what would it take to make you stop filing lawsuits and complaints, because I want to say this:  So you seem like a very principled person.  You seem like an educated person.  You don't seem reasonable.  You don't seem intelligent in the sense of having an intelligent defensible strategy because you're pursuing something that is not working for you.  You are not being responsible.  And you posed the question early on in your testimony, you said, "Well, what would a reasonable, intelligent, educated, responsible person do?  I would not lay down and die."  Well, there comes a time to lay down the weapons and die.
>
> MR. LUCAS:  I hear you.
>
> THE COURT:  And so, like I said, you're very articulate as you seem educated.  I think you're focused on parts of the law which you are sort of building into an edifice to sustain your litigation strategy, but they always say that the – a client who has himself as a lawyer – how does that go – has a fool for a client.
>
> MR. LUCAS:  Has a fool for a client.  I know that one.
>
> THE COURT:  That's – I think that's the direction – that's the road you're on.  You know, you're principled but you're focusing on the wrong principles.

R. Vol. III at 119. Again, read in context, the remarks reflect no intent to mock or insult Mr. Lucas. At most, the court was expressing some frustration at the situation, which does not require reversal. *See Liteky*, 510 U.S. at 555-56 ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.").

**B.     The court's handling of the hearing does not require reversal.**

Mr. Lucas also objects to the allocation of argument time at the hearing. He insists the defendants "were given 2 of the 3 hours, while Appellant only got one hour, and the Judge declar[ed] a hard stop at 5:00 pm due to the shutoff of air conditioning." Aplt Opening Br. at 32. "This precluded Appellant from calling [Peter Lucas], Dadson board member Pamela Lucas, and [the defendants'] attorney Mr. Bodine to the stand for questioning." *Id.* at 33. These accusations, however, do not accurately characterize the events at the hearing.

After the defendants called Mr. Lucas and Peter Lucas as witnesses, Mr. Lucas called himself as a witness. While he was on the stand, the court discussed with Mr. Lucas and the defendants' counsel what it would take to resolve the motion for sanctions. Mr. Lucas agreed to the entry of an order, and the court stated he could step down from the witness stand. Only then did the court observe "[a]ir-conditioning goes off right at the stroke of 5:00, so I keep a close eye on the clock. . . . You'll hear it go down in about 30 seconds. *So unless you all have*

*anything further*, the court will stand in recess." R. Vol. III at 130 (emphasis added). The parties did not comment, and the court adjourned.

Under these circumstances, the record does not support an inference the court deliberately gave the defendants more time than Mr. Lucas and then cut short Mr. Lucas's case simply because it was 5:00. Notably, Mr. Lucas never protested he did not have enough time to present his case, nor did he inform the court he wished to call other witnesses. The court's handling of the hearing, therefore, does not establish grounds for reversing the consent decree.

### C.    Mr. Lucas agreed to the entry of the June 9, 2023, order.

As we have explained, the record indicates the parties came to an agreement, and Mr. Lucas consented to the entry of the June 9, 2023, order. Mr. Lucas gives no reason why he should not be held to the terms he accepted. Nor does he argue the order did not accurately memorialize the terms reached in open court. We therefore affirm the June 9, 2023, order.

### CONCLUSION

We dismiss the portions of the appeal attempting to challenge the judgment, the amended judgment, and the denial of Mr. Lucas's motion to alter or amend the judgment. We deny as moot Mr. Lucas's Motion to Request Additions to the Record. We affirm the district court's June 9, 2023, order.

Entered for the Court


Veronica S. Rossman
Circuit Judge

11